UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| JANET EVANS, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | Case No.: 1:13-cv-00705-MHH |
| } | |
| CITY OF TALLADEGA, et al., } | |
| } | |
| Defendants. } | |

**MEMORANDUM OPINION**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the City of Talladega has asked the Court to enter judgment in its favor on the breach of contract and section 1983 claims that plaintiff Janet Evans has filed against the City. (Doc. 48). Ms. Evans's claims relate to her efforts to launch a production of her play *NaRu* at the Ritz Theatre, a historic landmark that the City owns. Initially, Ms. Evans contracted for her play to premiere at the theater in May 2012. Theater personnel rescheduled Ms. Evans's production for August 2012 and then postponed the production again. Ms. Evans contends that the City, through the Ritz Theatre's personnel, violated 42 U.S.C. § 1983 because the theater personnel discriminated against her by favoring a predominantly white production over her predominantly black production. Ms. Evans also contends that the City is liable for the Ritz Theatre's breach of contract.

1

The City maintains that the allegedly discriminatory actions of the theater's personnel do not subject the City to liability under section 1983 and, alternatively, that Ms. Evans has not provided evidence of discriminatory behavior. The City also argues that the theater's personnel lacked the authority to enter into contracts on the City's behalf. For the reasons stated below, the Court grants in part and denies in part the City's motion for summary judgment.

## I.   STANDARDS OF REVIEW

### A.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering a summary judgment motion, the Court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "The court need consider only the cited

materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**B.   Motions to Strike**

Both parties ask the Court to disregard some of the evidence in the summary judgment record. (Docs. 56, 57, 59). Under Federal Rule of Civil Procedure 56(c)(2), at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). These objections function like trial objections, and "[t]he burden is on the proponent [of the evidence] to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note (2010 amendments). If the Court finds that summary judgment evidence will be available at trial in an admissible form, then the Court may consider the evidence when deciding a summary judgment motion, even though the evidence is not in an admissible form at the summary judgment stage. For example, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (internal quotation marks omitted). A district court has broad discretion to determine at the summary judgment stage what evidence it will consider

pursuant to Rule 56(c)(2).  *See Green v. City of Northport*, 2014 WL 1338106, at *1 (N.D. Ala. March 31, 2014).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The City of Talladega owns the Ritz Theatre.  (Doc. 55-1, p. 4).  Each year, the Talladega City Council appropriates money to Talladega First, Inc. ("Talladega First"), a nonprofit organization, to operate the Ritz Theatre.  (Docs. 55-1, p. 26; 55-12, p. 3).[1]  Talladega First entered into an express contract with the City to "take[] the lead role in organizing various community resources with the mission of developing, funding, operating and managing the Ritz Theatre."  (Doc. 52-1).  Talladega First has a board of directors that sets the policy for the theater.  (Doc. 55-1, p. 6).  The board is comprised of local citizens, leaders of the community, volunteers, and representatives from different institutions in the community.  (Doc. 55-1, p. 6).

On October 29, 2011, Ms. Evans met with Gail Montgomery to discuss leasing the Ritz Theatre for a production of Ms. Evans's gospel play, *NaRu*.  (Doc. 55-2, p. 9).[2]  At the time, Ms. Montgomery was not the Ritz Theatre's manager, but she oversaw the theater's operations while the theater tried to fill the

---

[1] Ms. Evans's amended complaint also contained claims against Talladega First, Inc. d/b/a Antique Talladega, Inc.  (Doc. 24).  The Court dismissed Ms. Evans's claims against Talladega First on January 6, 2015 consistent with the parties' joint stipulation of dismissal.  (Docs. 61, 62).

[2] *NaRu* is "an African-American gospel and modern-day interpretation of the story of Naomi and Ruth."  (Doc. 52, p. 2).

management position. (Doc. 55-2, p. 11). Ms. Evans and Ms. Montgomery executed and signed a written agreement stating that Ms. Evans would rent the Ritz Theatre for her production on May 5, 2012 in exchange for $400.00. (Doc. 55-2, p. 12). Ms. Evans paid $400.00 to the Ritz Theatre. (Doc. 55-2, p. 12). The agreement also stated that Ms. Evans's group could come to the theater on May 4, 2012 to set up for her May 5 production and that she would use the theater's technicians at a rate of fifteen dollars per hour. (Doc. 55-2, p. 12). Sometime in November 2011, Ms. Evans and Ms. Montgomery met again and agreed that Ms. Evans would rent the Ritz Theatre in October 2012 for a second production of Ms. Evans's play. (Doc. 55-2, p. 13). On the same day, Ms. Evans paid another $400.00 to the Ritz Theatre. (Doc. 55-2, p. 13).

Also in November 2011, Talladega First hired George Culver to manage the Ritz Theatre. (Doc. 55-1, p. 3). Talladega First employed Mr. Culver and paid Mr. Culver's salary. (Doc. 55-1, p. 12).

In February 2012, Ms. Evans spoke on the telephone with Mr. Culver and told Mr. Culver that *NaRu* was scheduled for production at the Ritz Theatre on May 5, 2012. (Doc. 55-2, p. 15). Mr. Culver told Ms. Evans that he was aware of the play and that the theater was undergoing some maintenance. (Doc. 55-2, p. 15). A few weeks later, Ms. Evans and Mr. Culver spoke on the telephone again. (Doc. 55-2, pp. 15-16). Mr. Culver asked Ms. Evans whether she was willing to

reschedule her May 5, 2012 production to accommodate a spelling bee. (Doc. 55-2, pp. 15-16).[3] Ms. Evans told Mr. Culver that she would have to speak with her cast before giving Mr. Culver an answer. (Doc. 55-2, p. 16). Ms. Evans called Mr. Culver to let him know that she could switch dates to accommodate the spelling bee, and Mr. Culver told Ms. Evans that he no longer needed the theater on May 5, 2012. (Doc. 55-2, p. 16-17). Ms. Evans told Mr. Culver that she would nevertheless have to change the date of her production because her cast had already agreed to change the date. (Doc. 55-2, p. 17). Ms. Evans and Mr. Culver agreed to change the date of Ms. Evans's production from May 5, 2012 to August 25, 2012. (Doc. 55-2, p.18).

Over the next few months, Ms. Evans tried coordinating with the personnel at the Ritz Theatre to prepare for her production, but she could not get anyone to return her calls. (Doc. 55-2, pp. 19-21). Ms. Evans left several messages for Mr. Culver, but Mr. Culver did not respond. (Doc. 55-2, pp. 20-21).

On August 8, 2012, Ms. Montgomery returned one of Ms. Evans's calls and told Ms. Evans that the Ritz Theatre likely would not be able to hold her production on August 25, 2012. (Doc. 52-2, ¶ 8). Without success, Ms. Evans

---

[3] Mr. Culver disputes this fact and claims that he contacted Ms. Evans in February 2012 to ask Ms. Evans whether she was willing to reschedule her May 5, 2012 production to accommodate the Talladega High School drama club's production of a play called *Our Town*. (Doc. 55-1, p. 7). In April 2012, the Ritz Theatre held the Red Mountain Theater Company's production of a play called the *25th Annual Putnam County Spelling Bee*. (Doc. 55-1, p. 15). The Ritz Theatre eventually held the production of *Our Town* on May 3 and 4, 2012. (Doc. 55-3, p. 9).

6

tried contacting Mr. Culver to figure out why the Ritz Theatre could not accommodate her August 25, 2012 production date. (Doc. 55-2, p. 20). On August 15, 2012, Ms. Evans drove to Talladega and discussed her situation with Talladega's city manager, Brian Muenger. (Doc. 52-2, ¶ 10). Ms. Evans told Mr. Muenger that she was having problems with the Ritz Theatre and that the theater's staff was not responding to her. (Doc. 55-2, p. 21). Mr. Muenger told Ms. Evans that she would not be able to hold her production at the Ritz Theatre on August 25, 2012, because the theater was undergoing renovations, and the City could not allow anyone to enter the theater until the renovations were complete. (Doc. 55-2, p. 21). Mr. Muenger also told Ms. Evans that the personnel at the Ritz Theatre knew about the renovations well in advance and that they should not have scheduled her production for August 25, 2012. (Doc. 55-2, p. 21).

Ms. Evans did not reschedule her production and never held any productions at the Ritz Theatre. (Doc. 55-3, p. 7). Mr. Culver contacted Ms. Evans around October 2012 to tell her that he was refunding her money. (Doc. 55-2, p. 22).

Ms. Evans claims that she suffered $15,979.69 in economic damages as a result of the production's cancellation. (Doc. 55-7, pp. 10-34).[4] Ms. Evans also

---

[4] Ms. Evans provided the following itemized list of damages in an affidavit:

| | |
|---|---|
| Ritz Theatre rental: | $800.00 |
| Full-page advertisement with Da-sh Magazine: | $150.00 |
| Promotional commercial with BMP: | $380.00 |

contends that the cancellation caused her to suffer physical, emotional, and reputational harm.[5]

Ms. Evans filed a complaint against the City in federal court on April 15, 2013 (Doc. 1) and amended her complaint on August 14, 2014 (Doc. 24).[6] Ms. Evans claims that Mr. Culver, acting as a final policymaker for the City, favored a predominantly white production over her predominantly black production, thereby discriminating against Ms. Evans based on her race in violation of 42 U.S.C. § 1983.  Ms. Evans also claims that Talladega First, as an agent of the City, breached its contract with Ms. Evans.

| | |
|---|---:|
| Advertising posters and postcards: | $949.82 |
| Outbox poster for theater: | $40.00 |
| Ticket printing: | $92.87 |
| Programs printing: | $200.00 |
| Material and labor for custom Ritz stage backdrops: | $524.02 |
| Material and labor for custom set props: | $400.00 |
| Videographer and photos: | $375.00 |
| Musicians (saxophone, keyboard, drummer, bass player): | $1,200.00 |
| Food and refreshments for cast and crew: | $450.00 |
| Formal presentation gown: | $165.98 |
| Loss of income from missing two days of work attempting to rectify the problem: | $252.00 |
| Loss of projected proceeds from ticket sales (500 @ $20): | $10,000.00 |

(Doc. 55-2, p. 27).

---

[5] Ms. Evans asserts that the cancellation and the surrounding circumstances were very stressful to her, causing her to suffer mental anguish, anxiety, and elevated blood pressure.  (Doc. 55-2, p. 5).  Ms. Evans also claims that her "reputation in the performing arts community has suffered greatly."  (Doc. 55-2, p. 5).

[6] In ruling on the City's motion to dismiss, the Court dismissed Ms. Evans's section 1981 and promissory fraud claims alleged against the City.  (Doc. 37).

The parties engaged in discovery, and the City filed a motion for summary judgment. (Doc. 26). After an unsuccessful mediation (Doc. 42), the City filed an amended motion for summary judgment (Docs. 48, 49, 55). After the summary judgment briefing, both parties filed motions to strike portions of each other's evidentiary submissions. (Docs. 56, 57, 59). On this record, the Court considers the parties' motions to strike and the City's motion for summary judgment.

## III. MOTIONS TO STRIKE

Before the Court may decide whether the summary judgment record contains disputed material facts that preclude summary judgment on Ms. Evans's section 1983 and breach of contract claims, the Court must determine the scope of the summary judgment record. Ms. Evans asks the Court to strike from the record portions of an affidavit from Brian Muenger (Doc. 56) and facts listed in the City's summary judgment motion (Doc. 57). The City asks the Court to strike from the record statements that Ms. Evans made in two different affidavits and two of Ms. Evans's supporting exhibits. (Doc. 59). Because the Court did not rely on any of the challenged evidence, the Court denies the parties' motions to strike as moot.

## IV. MOTION FOR SUMMARY JUDGMENT

### A. § 1983

42 U.S.C. § 1983 provides that anyone who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." As a preliminary matter, the Court must determine whether the City is subject to liability under section 1983 before reaching the issue of whether Mr. Culver discriminated against Ms. Evans.

Municipalities may not be subject to liability under section 1983 on a theory of respondeat superior. *Hill v. Cundiff*, Nos. 14-12481, 13-15444 2015 WL 4747048, at *22 (11th Cir. Aug. 12, 2015) (citing *Denno v. Sch. Bd. Of Volusia Cty., Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000)). Generally speaking, municipalities may be subject to liability under section 1983 only when the execution of a government policy or custom causes a constitutional violation. *Id.* (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 479-80 (1986) (plurality opinion)). There is nothing in the record that indicates that the City has an official policy or custom, the implementation of which directs the City's officials to discriminate or otherwise commit constitutional harms. Therefore, Ms. Evans may not pursue her section 1983 claim under this general rule.

In the absence of a government policy or custom, "[m]unicipal liability may be imposed for a single decision by municipal policymakers" under certain circumstances. *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (citing *Pembaur*, 475 U.S. at 480). Specifically, "where action is directed by those who

establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur*, 475 U.S. at 481 (majority opinion). Such municipal liability attaches only where the decisionmaker has final policymaking authority with respect to the action ordered. *Cooper*, 403 F.3d at 1221; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("Only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.") (quoting *Pembaur*, 475 U.S. at 483). To determine whether Ms. Evans may pursue her section 1983 claim under this theory, the Court must determine whether Mr. Culver, the alleged perpetrator of the constitutional harm, is an official of the City who possesses the authority to make final policy.

Whether an actor is a municipal official with final policymaking authority is a question of state law. *Pembaur*, 475 U.S. at 483. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Id.* As the Supreme Court stated in *Praprotnik*:

> The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. Among the many kinds of municipal corporations, political subdivisions, and special districts of all sorts, one may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies. Without attempting to canvass the numberless factual scenarios that may come to light in litigation, we can be confident that state law

(which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.

*Praprotnik*, 485 U.S. 124-25 (internal citations omitted).

The record here indicates that Mr. Culver is not an "official" of the City, let alone one with final policymaking authority. Although the City owns the Ritz Theatre, it neither employs Mr. Culver nor pays his salary. Rather, Mr. Culver is an employee of Talladega First, a nonprofit organization that manages the city-owned theater.

Citing *Buckner v. Toro*, 116 F.3d 450 (11th Cir. 1997), Ms. Evans argues that Talladega First's contract with the City to operate the Ritz Theatre effectively makes Talladega First an extension of the City, thereby making Mr. Culver, as executive director of Talladega First, a municipal official with final policymaking authority. In *Buckner*, the Eleventh Circuit held that a private entity contracting with a municipality to provide medical services to inmates becomes functionally equivalent to the municipality because it performs a function traditionally within the exclusive prerogative of the state. *Id.* at 452.

Ms. Evans's reliance on *Buckner* is misplaced. The principle articulated in *Buckner* was limited to those specific circumstances in which a private entity contracts with a municipality to provide medical services to inmates. *See id.*; *Howell v. Evans*, 922 F.2d 712, 723-24 (11th Cir. 1991); *Ort v. Pinchback*, 786

F.2d 1105 (11th Cir. 1986). Ms. Evans provides no authority to support the proposition that *Buckner*'s holding extends broadly to any situation in which a private entity contracts with a municipality to perform some service. Additionally, neither *Buckner* nor the cases cited therein suggest that a private entity contracting with a municipality to operate a historic theater performs a function traditionally within the exclusive prerogative of the state. At most, the contract between the City and Talladega First establishes a principal-agent relationship, which is insufficient to subject the City to section 1983 liability. *See Hill*, 2015 WL 4747048, at *22.

Assuming that Mr. Culver was a municipal employee, he was not a "final policymaker" in his capacity as the Ritz Theatre's manager. "[A] municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997). Mr. Culver's undisputed testimony establishes that his decisions with respect to the Ritz Theatre's operations were subject to the overriding authority of Talladega First's board of directors. (Doc.55-1, p. 6). Such overriding authority precludes Mr. Culver from making final policy as it pertains to the Ritz Theatre, including the negotiation and execution of contracts between Talladega First and third parties. *See, e.g.*, *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir. 1991)

(holding that a mayor was not a final policymaker with respect to zoning ordinances when the city's charter gave the city council the authority to override the mayor's veto of zoning ordinances). Therefore, the Court finds that Mr. Culver is not a final policymaker for the City.

When a municipal official without final policymaking authority is responsible for an alleged constitutional harm, a municipality may be liable if the municipality's authorized policymakers ratify the subordinate's decision and the basis for it. *Praprotnik*, 485 U.S. at 127. Nothing in the record suggests that Mr. Muenger, acting as Talladega's city manager, ratified either Mr. Culver's decision to reschedule Ms. Evans's production or the basis for doing so. Mr. Muenger did not learn of Mr. Culver's decision to reschedule Ms. Evans's production until August 15, 2012, when Ms. Evans met with Mr. Muenger to discuss her problem. By this time, her original production date of May 25, 2012 had already passed. Even if Mr. Muenger wanted to override Mr. Culver's decision and honor Ms. Evans's August 25, 2012 production date, the Ritz Theatre's renovations would have prevented Mr. Muenger from doing so. Mr. Muenger's statement to Ms. Evans—that the personnel at the Ritz Theatre knew about the renovations and should not have scheduled Ms. Evans's production for August 25, 2012—suggests that Mr. Muenger disagreed with Mr. Culver's scheduling decision, not that he was aware of or approved any possible discriminatory basis for the decision. Thus, the

Court finds that Mr. Muenger did not ratify Mr. Culver's alleged discriminatory decision.

Based on the undisputed facts in the record, the Court finds that the City is not subject to liability under section 1983 for the alleged discriminatory acts of Mr. Culver or Talladega First. Therefore, the Court grants the City's motion for summary judgment as to Ms. Evans's section 1983 claim.[7]

### B.     Breach of Contract

Under Alabama law, a plaintiff must establish the following to prevail on a breach of contract claim: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *City of Gadsden v. Harbin*, 148 So. 3d 690, 696 (Ala. 2013) (internal quotation marks and citations omitted). Additionally, when an agent with real or apparent authority enters into a contract on behalf of a principal, the principal will be bound to the contract. *Lee v. YES of Russellville, Inc.*, 784 So. 2d 1022, 1027 (Ala. 2000).

There is substantial evidence in the record to establish that (1) Ms. Evans entered into a contract with Talladega First, (2) Ms. Evans performed under the contract by paying the theater $800 to hold her production on two separate

---

[7] Because the Court finds that Mr. Culver's actions do not subject the City to section 1983 liability, the Court need not decide whether Ms. Evans has presented sufficient evidence of discrimination.

occasions, (3) Talladega First failed to perform under the contract by informing Ms. Evans that she could not hold her production at the Ritz Theatre in August 2012, and (4) Ms. Evans suffered out-of-pocket losses and mental and reputational damages as a result of Talladega First's breach of contract. To hold the City liable for Talladega First's apparent breach of contract, Ms. Evans must demonstrate that Talladega First had authority as the City's agent to enter into a contract with Ms. Evans on behalf of the City.

Under Alabama law, "[t]he test for agency is whether the alleged principal has retained a right of control over the actions of the alleged agent." *Dickinson v. City of Huntsville*, 822 So. 2d 411, 416 (Ala. 2001). Establishing the right to control requires substantial evidence that the principal retained the right to direct the manner in which the agent conducted business. *Kennedy v. Western Sizzlin Corp.*, 857 So. 2d 71, 77 (Ala. 2003). "An agent's authority to contract on behalf of his principal must be either express, implied, or apparent." *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297, 304 (Ala. 1986). "[A]uthority can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf." *Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc.*, 426 So. 2d 859, 861 (Ala. Ct. App. 1983).

According to Mr. Culver, the City could control the theater's operations—which presumably include the formation of contracts—by deciding not to renew Talladega First's contract with the City for the following year, thereby cutting off Talladega First's funding for the theater. (Doc. 55-1, p. 19). The contract between the City and Talladega First, which directs Talladega First to report the details of its operation to the City, also shows that Talladega First's operations were under the City's control.[8] This evidence creates a question of fact regarding agency.

The evidence also suggests that Talladega First had the authority to enter into contracts on behalf of the City for matters concerning the theater's operations. The contract between Talladega First and the City expressly directs Talladega First "[t]o work toward the complete development of the Ritz Theater and serve as liaison to architects and contractors as needed, as well as plan the funding and programming activities for its use after renovation." (Doc. 52-1, p. 3). This written delegation of authority—namely, to "serve as liaison to . . . contractors as needed" and to "plan the funding and programming activities for its use"—

---

[8] The contract provides: "The officers and representatives of Talladega First Inc. shall provide the City an annual written report by August 1 of 2012, setting out all action taken by Talladega First Inc. pursuant to this contract. The report shall be submitted to the City Manager of Talladega. The report shall be specific and detailed and shall refer to all actions taken and including a listing of the Board of Directors or members of the organization, a financial report, a report detailing the number of citizens of the City of Talladega your agency has served, the types of services provided and the accomplishments of the agency during the past fiscal year." (Doc. 52-1, p. 3).

reasonably could cause Talladega First to believe that the City desired Talladega First to act on the City's behalf in forming contracts such as the one at issue.

Therefore, the Court denies the City's motion for summary judgment as to Ms. Evans's breach of contract claim.

## V. SUPPLEMENTAL JURISDICTION OVER MS. EVANS'S STATE LAW CLAIM

A district court may decline to exercise supplemental jurisdiction over a pendent state law claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Once section 1367(c)(3) is satisfied, "the district court possesses the discretion to dismiss supplemental claims" and must weigh a "host of factors." *Ameritox, Ltd. v. Millennium Labs., Inc.*, No. 14-14281, 2015 WL 5155240, *10 (11th Cir. Sept. 3, 2015) (citing *Utd. Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966) and *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

The Court has examined the factors set out in *Gibbs* and *Cohill*. Those factors weigh in favor of dismissing Ms. Evans's breach of contract claim. Therefore, the Court dismisses without prejudice Ms. Evans's breach of contract claim against the City.[9]

---

[9] The Court reminds the parties that "[t]he period of limitations for any claim asserted under [supplemental jurisdiction], and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under [supplemental jurisdiction], shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d).

## VI. CONCLUSION

For the reasons stated above, the Court **ORDERS** as follows:

(1) The Court **GRANTS** the City's motion for summary judgment as to Ms. Evans's section 1983 claim and **DENIES** the City's motion for summary judgment as to Ms. Evans's breach of contract claim (Doc. 48);

(2) The Court **DENIES** both parties' motions to strike as moot (Docs. 56, 57, and 59);

(3) The Court directs the Clerk to please **TERM** Docs. 48, 56, 57, and 59;

(4) The Court **DISMISSES WITH PREJUDICE** Ms. Evans's section 1983 claim and **DISMISSES WITHOUT PREJUDICE** Ms. Evans's breach of contract claim.

The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 28, 2015.

_/s/ Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE